STEARNS SALT & LUMBER CO. v. NEWBERG.

ADVERSE POSSESSION—LIMITATION OF ACTIONS—TRIAL—APPEAL AND ERROR.

Giving to defendant's testimony its strongest probative force, in ejectment, there was evidence tending to support his claim of adverse possession, and raising a question of fact which should have been submitted to the jury, where it appeared that defendant occupied land of plaintiff abutting on a lake with a fishing shanty for 35 years, not knowing who owned it but claiming title as a squatter; since defendant

was a trespasser, subject to the usual remedies from the beginning, and the question of the hostile character of his possession was erroneously decided by the trial court as a question of law.

Error to Mason; Withey, J. Submitted January 16, 1912. (Docket No. 80.) Decided May 31, 1912.

Ejectment by the Stearns Salt & Lumber Company against Andrew Newberg, to try title to real property. A judgment for plaintiff upon a verdict directed by the court is reviewed by defendant on writ of error. Reversed.

*Robert J. Quail,* for appellant.

*A. A. Keiser,* for appellee.

BLAIR, J. This is an action of ejectment to try the title to a small parcel of land, 12 feet wide and 22 feet long, entirely occupied by defendant's fishing shanty, upon the shore of Pere Marquette Lake, and within the limits of the city of Ludington. It was agreed that the record title to the land was in the plaintiff; but defendant claimed to have acquired title by adverse possession. The circuit judge directed a verdict for plaintiff, and defendant seeks a reversal of the judgment by this court.

In determining whether there was any testimony tending to support defendant's claim, we must give to the testimony in his favor its greatest probative force. So considered, the testimony tends to show that in 1875 the defendant constructed the fishhouse in question, to be used by him in carrying on his business as a fisherman. He testified:

"I have occupied it since 1875. I claimed to own the land from the time that I went on there. I thought I had a right to go there. I never made any lease with anybody. I never got any permission or anything of that kind from anybody. I did not know who owned the record title of the property over there. I couldn't tell who owned it. The land is sandy. There is nothing carried

on over there outside of the fishing business.  *  *  *
The shanty is calculated to be 24 feet long and 12 feet
wide.   The shanty rests part on the land and part on the
water.   We have got sills under the shanty and under
the dock, some long sills.   The sills extend out under the
dock in front of the shanty.   The dock is 8 feet wide.
*  *  *   The shanty is lumber.   It is built with sills.
There is 2-inch floor on the top of the sills, 12 feet long,
most of them 6 inches wide.   The roof is first boards and
then tar paper.   The shanty is not built of stuff that I
picked up along the lake.   I generally buy my stuff. The
last I got at Cartier's mill.   This shanty has been there
on this spot 35 years.   It is the same shanty, only it has
got to be fixed up a little bit, repaired from time to time.
*  *  *   I carry on my business over there as long as I
can, till we freeze out in the fall of the year, and start as
early as I can in the spring, generally in the month of
March.   We carry on our business every day steady,
when we can get out.  *  *  *

"*Q.* Had there been any shanties similar to this of yours
torn down there or taken away, like yours?

"*A.* No; not like mine; none of them.

"*Q.* I mean have there been others like yours that were
torn down?

"*A.* No; not any; not any fish shanties, except what
caved in, and they had to rebuild them up.  *  *  *

"*Q.* Had there been different persons over there fishing
at different times?

"*A.* Always the same persons; the same ones is there
yet that has been; and some more come.  *  *  *

"*Q.* Why did they cave in?

"*A.* Sometimes when the hard current there, on the
start, sometimes.   The sand seemed to be like quicksand.

"*Q.* The water washed it away?

"*A.* The water washed it away; and it seemed to sink
right down.   It was caved in there about three or four
times already, that I know of, since I came there, in dif-
ferent places, except in my place, what I owned; there it
never caved in.   I claim to own the land what I got my
shanty on, and dock, and so on.   I never paid any taxes
on it.   I told people that I claimed to own it as quick as
I moved on it.   I always tell it was my place.   I told
most every one I know.   Mr. Palm is one.   I never meas-
ured it; but I know how far it goes, how far I occupy it.
I never paid any taxes on it."

He further testified, on cross-examination:

"*Q.* When you moved on the other side, on the west side of the lake, did you think that was government land?

"*A.* No; I didn't know whose it was.   *   *   *

"*Q.* Upon the first trial of this case you testified: 'There was some land where we calculated to move first, towards Butters; and then they told us not to move over there. They said we should move over there; but that belonged to the government.' Do you remember testifying to that?

"*A.* I don't remember anything like that. I didn't know who it belonged to, only—

"*Q.* Well, did you testify to that upon the first trial, or did you not?

"*A.* I don't remember that.   *   *   *

"*Q.* Then I asked you this question, 'You thought the government owned it?'

"*A.* No.

"*Q.* And didn't you answer: 'Yes; we thought the government owned it; but then we found out that they didn't?' Did you testify to that?

"*A.* I don't remember.   *   *   *

"*Q.* And didn't I ask you this: 'When did you find out that the government didn't own it?' And you answered: 'I found it out when we got a notice. We wrote to the government; and they said they hadn't owned it.' Did you testify to that?

"*A.* Why, I don't know who owned it, if they didn't own it.

"*Q.* And I asked you this question, 'Up to that time you supposed the government owned that land?' And didn't you answer: 'We had a right to stay there. I didn't know who owned it, whether the government or anybody. I thought it was like a squatter's claim; but we wanted to find out who did own it for sure.' Didn't you answer that?

"*A.* Maybe I did answer that; but I don't know who owned it today.

"*Q.* You say you don't know today who does own it?

"*A.* No, only that possibly I may. I claim myself to. But I don't know who owned it, or got title to it. It probably belonged to somebody; but I can't tell who.   *   *   *

"*Q.* You don't claim to have bought this, or paid for it to any one?

"*A.* No; but sometimes we get land in this country by squatting; squatters generally get land in this country, too.

"*Q.* Is that what you understand you did in this case?

"*A.* Yes, sir.

"*Q.* You moved on there as a squatter?

"*A.* Yes; and occupied it ever since.   *   *   *

"*Q.* Why didn't you pay rent over there?

"*A.* Who would you pay it to?

"*Q.* I don't know.  Was that why you didn't pay it?

"*A.* Why, it was my own place.  Why should I pay rent?

"*Q.* You think it was your own place?

"*A.* Yes, sir.   *   *   *

"*Q.* Didn't I ask you this question upon that trial: 'Your position in this case is, or your claim is, that nobody else owns this land?' and you answered, 'Yes.' Is that your claim that nobody else did?

"*A.* I thought I said I owned it more than any one else.

"*Q.* Didn't you testify in answer to that question, 'Your position in this case is that nobody else does own it?'  And you answered, 'Yes.'

"*A.* Why, somebody, I suppose, must have owned it.

"*Q.* And then I asked you this question, 'Then nobody else has a right to put you off?'

"*A.* 'Yes; that is what I claim.'

"*Q.* Is that what you testified to?

"*A.* Yes; that is what I claim; they had no right to put me off.   *   *   *

"*Q.* Now, I want to get this clear.  Do you say here that at the time you wrote to the government office that that was for the purpose of finding out who owned it?

"*A.* Yes, sir.

"*Q.* Now, you have testified that you thought you owned it.  Now tell us what you mean.

"*A.* Well, I owned it all right enough; but I mean all over the whole island, I mean.

"*Q.* You were writing about the entire point, were you?

"*A.* The entire point, yes; that is all."

The time he wrote to the government was in 1908, after notice to quit.

The trial judge bases his decision largely upon two

findings of fact: (1) That defendant supposed that the Federal government owned the land; (2) that when the building was put there the water was under it, and the lake was a meandered lake. Summing up at the conclusion of the charge, the judge said:

"I do not believe that a man who goes upon shore line property, where even the shore line itself changes from day to day and from week to week and from month to month, and is never well defined and is never established, and locates and erects a pier of a very frail nature in the water, and attaches to it a building, which was at that time over the water, and says that he thinks the Federal government owns it, and does not pretend to say that he ever changed his mind through all the years that he has occupied it, or ever knew any differently, and says that he went there as a squatter and continued there as a squatter, I do not believe that man can say he has obtained title by adverse possession, and I so hold, and give the defendant the benefit of an exception."

We do not think it can be held as an indisputable fact that defendant supposed that the Federal government owned the land; and there is no testimony to support the second finding. It is the claim of plaintiff's counsel, however—

"That the defendant has occupied by permission and indulgence, without color or claim of title, and in a manner entirely consistent with title in the plaintiff, as follows," etc.

We think the defendant's testimony, if credited by the jury, would have unquestionably supported a finding of all of the elements of an adverse possession, unless it be the element of hostility. As to this element, defendant testified that he built his fish shanty upon the land, supposing that some one owned it; but, not knowing who, he claimed to own it from the outset, and so told almost every one he knew, and that he never had permission from anybody to occupy it; that he used and occupied it for 35 years, during the fishing season, as any one would use his own property. Under his testimony, he was a

trespasser from the outset, and subject to any legal remedies the owner might see fit to invoke on account of his occupancy, when discovered; and it was for the jury to say, under the circumstances, whether his open, visible, and notorious possession was, or was not, a hostile possession, and should not have been discovered to be such by the owner more than 15 years before bringing this action. There may be some custom relative to the placing of these fishing shanties along the shore which distinguishes their occupancy from other buildings as notice of an adverse claim; but, if so, it does not appear in this record. We are therefore of the opinion that the court should have submitted the case to the jury.

The judgment is reversed, and a new trial granted.

MOORE, C. J., and STEERE, MCALVAY, BROOKE, STONE, and OSTRANDER, JJ., concurred. BIRD, J., did not sit.